CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 23 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **TAMARA K. HALSEY**<br>Plaintiff, | )<br>)<br>) Civil Action No. 1:08cv00004<br>) |
| v. | ) **MEMORANDUM OPINION**<br>)<br>) |
| **MICHAEL J. ASTRUE,**<br>**Commissioner of Social Security,**<br>Defendant. | )<br>) By: GLEN M. WILLIAMS<br>) SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Tamara Halsey, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Halsey's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

1

be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Halsey filed her application for DIB on April 18, 2006, alleging disability as of October 20, 2005, due to pain from a right hip injury. (Record, ("R."), at 13, 52, 66, 69-70.) The claim was denied initially and upon reconsideration. (R. at 23-35.) Halsey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 36.) A hearing was held before the ALJ on September 27, 2007, at which Halsey was represented by counsel. (R. at 316-60.)

By decision dated November 5, 2007, the ALJ denied Halsey's claim. (R. at 13-19.) The ALJ found that Halsey met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 15.) The ALJ determined that Halsey had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 15.) The ALJ also found that Halsey suffered from back pain. (R. at 15.) The ALJ found that this impairment was "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). (R. at 15.) However, the ALJ determined that Halsey did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ also found that Halsey possessed the residual functional capacity to perform a limited range of sedentary

2

work[1] that allowed Halsey to lift or carry items weighing up to 10 pounds. (R. at 16). The ALJ found that Halsey was able to stand or walk up to two hours in an eight hour day, and sit up to six hours in an eight-hour day. (R. at 16.) In addition, the ALJ found that the claimant could occasionally kneel, crouch, crawl, balance and stoop. (R. at 16.) The ALJ also found that the claimant should not work at heights, should not climb ladders, ropes or scaffolds and should work in temperature controlled environments. (R. at 16.) The ALJ determined that Halsey was capable of performing past relevant work as a marketing/public relations person and business office manager. (R. at 18.) The ALJ further stated that such work does not require the performance of work-related activities precluded by the Halsey's residual functional capacity. (R. at 18.) Therefore, the ALJ found that Halsey was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 18.) *See* 20 C.F.R. § 404.1520(f).

After the ALJ issued his decision, Halsey pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 9.) The Appeals Council denied Halsey's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8.) *See* 20 C.F.R. § 404.981 (2006). Thereafter, Halsey filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Halsey's motion for summary judgment, filed November 21, 2008, and on the Commissioner's motion for summary judgment, filed December 10, 2008.

## II. Facts

---

[1] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a)

3

Halsey was born in 1962, which classified her as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 45.) According to the record, Halsey has a college education and past relevant work experience as a business office manager and in marketing and public relations. (R. at 70.) Halsey's alleged condition resulted from an injury she suffered due to a motor vehicle accident where she experienced torn muscles, tissue and nerve damage. (R. at 69.)

At Halsey's hearing before the ALJ on September 27, 2007, she testified that she was working at Bluefield Regional Medical Center as a marketing/public relations director, where she worked for 17 years. (R. at 329.) Halsey testified that she had an associates degree in business management and a bachelors degree in business management and marketing. (R. at 329.) At this job, Halsey stated that she was responsible for all employee newsletters and publications, all media relations, board packages, health fairs and conferences. (R. at 330.) Halsey noted that she was responsible for the creative part of writing up publications and printing them out, in order to get them to physicians, employees or to the public. (R. at 330.) Halsey stated that she would copy 2,000 or 3,000 documents several times a day, and she would often carry these around to doctor's offices. (R. at 330-31.) Rather than try to find a cart to distribute the box of documents, Halsey noted that it was easier to pick up a big case of brochures and carry them up several flights of stairs. (R. at 331.)

Halsey testified that she used the elevators sometimes; however, the elevators were really reserved for patients. (R. at 331.) Halsey stated that she had always been very athletic and it was just easier to go out the door and across the

parking lot, as most of the doctor's offices were across parking lots and campuses. (R. at 331.)  When asked how much she had to lift on a weekly basis, Halsey responded that she would lift anywhere from 30 to 60 pounds at any given time, everyday, several times a day.  (R. at 332.)

Halsey testified that she left her job to help her husband start an all-terrain vehicle, ("ATV"), motorcycle store.  (R. at 332.)  Halsey noted that, because they were starting a new business, she was paid very little while they were trying to get the business up and running.  (R. at 332.)  Halsey stated that her new job consisted of running the business office, which included the accounting, the payroll, finalizing deals and other activities including stocking and cleaning to make the business operational.  (R. at 333.)  She stated that the job required her to work about 10 to 12 hours a day, six days a week and sometimes on Sundays.  (R. at 333.)  The ALJ noted that, in 2002, Halsey reported zero salary.  (R. at 333.) Halsey stated that this was because her husband could not afford to put her on the payroll yet because all money made was put directly back into the business.  (R. at 333.)  The ALJ then noted that in 2004, Halsey reported income of $7,400, which Halsey explained was from being put on her husband's payroll.  (R. at 334.)

Halsey stated that she was in a car accident on September 5, 2004, and had been working consistently up until that point.  (R. at 334.)  She stated that her husband kept her on the payroll after the accident, despite the fact that she scaled back her hours because of doctor's appointments and physical therapy.  (R. at 335.) Halsey stated that she would go in for an hour or so to answer questions from the staff and help with the computer, but otherwise she was unable to stay there and work.  (R. at 335.)  The ALJ noted that, in 2005, Halsey reported income of

Case 1:08-cv-00004-GMW-PMS   Document 23   Filed 01/23/09   Page 5 of 41   Pageid#: 460

$19,320, which was the result of a raise Halsey received from her husband. (R. at 335.) When asked what activities she did of value in 2005, Halsey stated that, other than the part-time work of answering questions and processing paperwork, she did not do anything physical. (R. at 336.) Halsey testified that, in 2005, she was working no more than six, eight or ten hours per week due to her physical condition. (R. at 336.) The ALJ noted that her husband paid her $19,000 a year to work six, eight or ten hours per week. (R. at 336.)

When the ALJ accused Halsey of making a salary she did not earn, Halsey explained that her husband could pay her as much he wanted, and that she was co-owner of the business. (R. at 337.) The ALJ explained that co-owners take their income from profits, rather than by paying themselves a salary they do not earn. (R. at 337.) Halsey further clarified that her work after the accident consisted of mainly business office clerical work, rather than any physical labor. (R. at 338.) Halsey also stated that the business had to hire two new bookkeepers to replace her after the accident. (R. at 338.)

Halsey stated that, in 2005, her husband sold the motorcycle business to Halsey's step-son. (R. at 338.) Halsey further stated that, at the time of the hearing, her husband ran a car restoration shop, and restored classic cars and sold them over the internet. (R. at 339.) She stated that her husband only had one employee at his new business. (R. at 339.) In addition, Halsey noted that her husband had a certified public accountant, ("CPA"), who performed the bookkeeping duties. (R. at 339.) Halsey denied doing any work to assist her husband in his new car business. (R. at 340.) Halsey stated that she did not make any profit upon selling the ATV business in 2005 because of other businesses that

6

were tied to it. (R. at 340.) Those business, she stated, financially drained the ATV business. (R. at 340.) Among these other businesses were some rental properties and some rent-to-own stores. (R. at 340.) Halsey stated that other than doing some occasional cleaning and painting of a rental property, she took no part in running those other businesses. (R. at 340.)

Since the sale of the ATV business in 2005, Halsey stated that she had not been doing a lot, other than going to doctor's appointments and physical therapy. (R. at 341.) Halsey stated that she intended to have disc replacement surgery if her current treatment was ineffective. (R. at 341.) Halsey noted that she frequently missed church because of her injury; however, she was able to attend her daughter's cheerleading performances in high school. (R. at 342.) Halsey stated that she was currently unable to attend her daughter's tennis games in college because of the pain in her back. (R. at 343.) Halsey explained that she was unable to get outside and walk because of the pain. (R. at 343.) In addition, Halsey stated that she was unable to do housework, and she had to hire a housekeeper to come every other week. (R. at 343.) Halsey stated that she was unable to run a vacuum cleaner, go grocery shopping or do laundry without the help of her daughter. (R. at 343.) Despite using ergonomic mats and cushions, Halsey stated that she received no relief from the pain. (R. at 345.)

Halsey stated that, occasionally, if she started cooking dinner, her husband had to finish because it was too painful for her to stand on the tile in the kitchen. (R. at 344.) Halsey further stated that she was unable to wash dishes or stand over the stove because of the pain, noting that she also was unable to bathe her dog because it was too painful to bend over. (R. at 344.) Halsey noted that she was no

7

longer able to jog, play tennis, snowboard or travel because of her injury. (R. at 345.)

Halsey testified that she took about 12 or 13 different medications, all of which made her nauseous and did not alleviate her pain. (R. at 346.) Halsey further testified as to the qualifications of her doctor, Dr. Deer. (R. at 346.) Halsey stated that Dr. Deer told her try intradiscal electrothermic therapy, ("IDET"), a procedure by which a needle is used to heat the disc surgically, but the effect lasts only six to eight months. (R. at 323, 347.) According to Dr. Deer, Halsey stated that there was a 50 percent chance that the procedure would help, however, after five years, he recommended disc replacement surgery. (R. at 347.)

With regard to her motor vehicle accident, Halsey stated that her car was hit by a college student in Charleston, West Virginia. (R. at 348.) Halsey stated that they were scheduled to go to court in either November or December, and that the insurance company had not yet settled the case. (R. at 349.) The ALJ asked further questions about Halsey's ATV motorcycle business. (R. at 350.) Halsey stated that they had 300 customers on average each day and that they were open six days a week. (R. at 350.) Halsey stated that she dealt with 200 different vendors for things such as parts, gloves and helmets. (R. at 351.) Halsey stated that they had 12 employees. (R. at 351.)

Ann Marie Cash, a vocational expert, also testified at Halsey's hearing. (R. at 352.) Cash identified Halsey's past relevant work as a marketing/public relations worker as sedentary and skilled work. (R. at 353.) Cash testified that

Halsey performed her work at a medium[2] exertional level. (R. at 353.) Cash also identified Halsey's past relevant work as a business office manager as sedentary and skilled and that Halsey performed this work at a medium exertional level. (R. at 353.)

The ALJ then asked Cash to consider a hypothetical claimant of the same age, education and past work experience as Halsey. (R. at 349.) In addition, the ALJ asked Cash to assume that the claimant could work at a sedentary exertional level and to assume that the claimant would need to sit and stand in place for brief postural changes throughout the day. (R. at 353.) However, the hypothetical claimant should never climb, but could occasionally crouch, crawl and stoop. (R. at 353.) In addition, this hypothetical claimant should not work at heights, nor climb ladders, and such an individual should work in a temperature-controlled environment. (R. at 353.) Based upon this hypothetical, the ALJ asked Cash to identify any jobs that such an individual could perform. (R. at 353.) Cash opined that such a claimant could perform both the jobs that Halsey once performed, i.e. marketing/public relations worker and business office manager. (R. at 354.) Cash opined that, for the region, there were approximately 3,200 marketing and public relations jobs, with 169,000 jobs nationally, as well as approximately 4,000 business office manager jobs. (R. at 354.) When asked if the hypothetical claimant's pain would reduce productivity and concentration as much as 30 percent of the day would there be any jobs, Cash stated that there would be no jobs. (R. at 356.)

---

[2] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c) (2008).

9

Halsey's counsel asked Cash to consider that the individual would be required to miss one day of work per week for medical appointments and physical therapy. Halsey's counsel then asked if such an attendance pattern would be permitted. (R. at 357.) Cash testified that the rules differ, and for skilled work, the employers would tolerate such an absence for about six months, but no longer. (R. at 357.) Halsey's counsel asked Cash whether employers would permit three absences per week, to which Cash stated that it would be tolerated for a short period of time, but not longer. (R. at 358.) Halsey stated that, for a three year period, she was often in physical therapy three days per week for hour and a half sessions. (R. at 358.)

In rendering his decision, the ALJ reviewed records from UVA-Healthsouth; James R. Beazell, a physical therapist; Dr. Andrew M. Schuett, M.D.; Physical and Occupational Therapy Services, Inc.; Bluefield Regional Medical Center; University of Virginia Pain Management Center, ("UVA"); Bluefield Internal Medicine; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Aroon Suansilppongse, M.D., a state agency physician; St. Francis Hospital; Dr. Timothy Ray Deer, M.D.; and Dr. Richard G. Bowman, M.D. Halsey's attorney also submitted a medical evaluation from Dr. Robert P. Kropac, M.D., dated October 18, 2007, to the Appeals Council.[3]

---

[3] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

Case 1:08-cv-00004-GMW-PMS   Document 23   Filed 01/23/09   Page 10 of 41   Pageid#: 465

On September 10, 2004, Halsey presented to Dr. Schuett with complaints of pain in her right hip and right sacroiliac joint as a result of being a passenger in a motor vehicle accident. (R. at 167.) Halsey denied having a history of previous injury, and also noted some pain over the proximal medial border of the right tibia. (R. at 167.) Upon examination, Dr. Schuett noted that Halsey appeared to be in no acute distress, and that her abdomen was soft and bowel sounds were positive. (R. at 167.) Dr. Schuett noted positive tenderness over the right sacroiliac joint and right inferior iliac crest. (R. at 167-68.) A hip examination revealed 90 degrees of flexion, 45 degrees of external rotation and 15 degrees of internal rotation, while a knee exam revealed 0-120 degrees of flexion/extension. (R. at 168.) Dr. Schuett noted mild tenderness from the mid to distal aspect on the medial border. (R. at 168.) Dr. Schuett diagnosed Halsey with right lower extremity pain and tenderness over the right sacroiliac joint, and recommended a follow-up in one week. (R. at 168.)

On September 20, 2004, Halsey presented to Dr. Schuett with complaints of right hip pain. (R. at 166.) Dr. Schuett noted that the right hip was non-tender over the sciatica region, but noted positive tenderness over the right sacroiliac joint. (R. at 166.) Dr. Schuett recommended a Medrol Dosepak as a secondary intervention technique, a computerized axial tomography, ("CAT"), scan of the pelvis and continued therapy. (R. at 166.)

On October 11, 2004, Halsey again presented to Dr. Schuett with right hip and soft tissue related pain. (R. at 165.) Dr. Schuett noted that Halsey had been given a Medrol Dosepak, a coricosteriod and lidocaine injection into several trigger points and appropriate physical therapy. (R. at 165.) Halsey stated that her

11

physical therapy sessions exacerbated her pain, but reported no numbness or tingling in the right lower extremity. (R. at 165.) Dr. Schuett noted that Halsey had a CAT scan with a magnetic resonance imaging, ("MRI"), of the pelvis revealing no sign of fracture or obvious displacement of the major pelvis structures. (R. at 165.) Dr. Schuett recommended water therapy and for Halsey to follow up in one month. (R. at 165.)

On January 24, 2005, Halsey again presented to Dr. Schuett with complaints of right hip pain. (R. at 164.) Dr. Schuett noted that Halsey had been placed on numerous regimens including water therapy versus gravity exercises, but reported no improvement of pain. (R. at 164.) Dr. Schuett noted that Halsey's pain also radiated into the tensor fascia lata of the right leg. (R. at 164.) Halsey denied bowel or bladder dysfunction. (R. at 164.) Dr. Schuett recommended a follow-up with UVA. (R. at 164.) Halsey declined the offer of additional pain medications. (R. at 164.)

On February 15, 2005, Halsey presented to James R. Beazell, a physical therapist at UVA-Healthsouth Sports Medicine and Rehabilitation Center, with complaints of pain in her right spine. (R. at 157.) Halsey complained of constant pain in her right buttocks after sitting, driving or lying on her right side in her sleep. (R. at 158.) Halsey described the pain as burning, aching and tearing, which stemmed from a motor vehicle accident. (R. at 158.) Halsey had been a front seat passenger when another car slammed into her car, and she described the injury as feeling "like [her] hip jammed." (R. at 158.) Beazell opined that Halsey required skilled rehabilitative therapy in conjunction with a home exercise program to address the problems and achieve certain goals. (R. at 159.) Beazell stated that

12

the overall rehabilitation potential was good, and that Halsey exhibited good understanding and performance of the rehabilitation sessions. (R. at 159.) Beazell further stated that additional visits for incremental advancement and progression would be required periodically. (R. at 160.)

On March 2, 2005, Halsey returned to Beazell for further treatment on her right spine. (R. at 156.) Beazell stated that Halsey tolerated the treatment with marked complaints of pain and difficulty. (R. at 157.) He further noted that Halsey exhibited a slight capacity for advancement of therapeutic activity during treatment, and he noted trace improvements with an identified impairment. (R. at 157.)

Between October 14, 2004, and September 23, 2005, Halsey underwent physical therapy at UVA-Healthsouth.[4] (R. at 169-193.) Included in her physical therapy was aquatic therapy. (R. at 169.) On October 14, 2004, Halsey underwent a pelvic MRI at Bluefield Regional Medical Center, which showed no abnormal marrow pattern in the femoral head or acetabular regions, or in the sacroiliac region. (R. at 198.) Additionally, the MRI showed no abnormal fluid collection and was described as an "essentially negative exam." (R. at 198.) On December 22, 2004, Halsey underwent another pelvic MRI, which showed no abnormal marrow pattern in the femoral head or acetabular regions, or in the sacroiliac region. (R. at 197.) However, the exam showed an apparent two centimeters left ovarian cyst not evident previously. (R. at 197.) On January 16, 2005, Halsey underwent another pelvic MRI, which showed two ovarian cysts within normal

[4] The physical therapy progress notes are largely illegible, but it can be ascertained that Halsey stated that the physical therapy exacerbated her pain. (R. at 165.)

limits. (R. at 195.)

In March 2005, Dr. Schuett referred Halsey to UVA. (R. at 229.) Halsey first presented to UVA on March 22, 2005, with complaints of pain in her right hip, which had been present for approximately six months. (R. at 226.) It was noted upon examination that Halsey had mild sacroiliac joint tenderness in the right side, but demonstrated 5/5 muscle strength in hip flexors, knee flexors and extensors, as well as ankle flexors and extensors bilaterally. (R. at 229.) While it was noted that were was no tenderness or trigger points in the musculature in the bilateral lower extremities, Halsey did exhibit remarkable point tenderness on palpitation of the greater trochanter of the right hip. (R. at 229.) It was noted that Halsey's deep tendon reflexes, ("DTRs"), were 2+ in the knee and ankle bilaterally, and she had normal sensation to light touch in the lower extremities. (R. at 229.) Among the treating physicians impressions were "greater trochanter bursitis." (R. at 229.) It was recommended that Halsey return for an injection of the greater trochanteric bursa, and she was prescribed Bextra. (R. at 229.)

On April 15, 2005, Halsey presented to UVA for a right trochanteric bursa injection to treat her complaints of right hip pain with radiation down the lateral aspect of the right thigh. (R. at 223.) It was noted that Halsey had a second complaint of left-sided posterior neck pain. (R. at 223.) Halsey explained that she had been sleeping on her stomach to avoid lying on her painful right hip, which resulted in some strain in her neck, and she stated that she was experiencing paresthesias of the left shoulder and spasms in the left posterior neck. (R. at 223.) Upon examination, it was noted that Halsey had a full range of motion in her neck with flexion, extension and rotation. (R. at 223.) It was noted that Halsey had

14

tenderness of the left paravertebral musculature of the cervical spine. (R. at 223.) It also was noted that her left upper trapezius was tender, however, Halsey had no right-sided tenderness or tenderness upon palpitation of the cervical vertebral processes. (R. at 223.) In addition, a lumbosacral examination revealed acute tenderness over the right sacroiliac joint as well as the right iliac crest. (R. at 224.) Upon examination of the right hip, Halsey had marked tenderness present over the right trochanteric bursa. (R. at 224.) Following the procedure, Halsey was stable and ambulatory upon discharge. (R. at 224.)

On May 20, 2005, Halsey returned to UVA for a right bursa injection and aright piriformis trigger point injection. (R. at 220.) It was noted that Halsey's pain had subsided after her last injection for about two weeks before her pain symptoms returned. (R. at 220.) Halsey returned with complaints of pain which she rated as seven to eight on a 10-point scale, noting that the pain was in her right hip radiating down the lateral part of her right thigh. (R. at 220.) Halsey also presented with complaints of left-sided neck pain, that moved down her left shoulder and arm, associated with a tingling sensation. (R. at 220.) An examination of Halsey revealed symptoms of tenderness on the right side of the neck or right shoulder or trapezius, as well as tenderness in the right hip in the region of the piriformis. (R. at 220.) It also was noted that Halsey had tenderness along the right trochanteric bursa, as well as tenderness along the lateral thigh. (R. at 221.) Halsey tolerated the treatment well, and she was discharged in good condition with plans to return in two weeks for a repeat trochanteric bursa injection and possibly a repeat trigger point injection. (R. at 221.)

On July 8, 2005, Halsey presented to UVA for a right trochanteric bursa

injection and right piriformis trigger point injection. (R. at 217.) Halsey reported her pain as seven to eight on a 10-point scale, but denied having significant neck or shoulder pain at the time of the visit, both of which she stated had improved since her previous visit. (R. at 217.) An examination of Halsey revealed tenderness in her right hip in the area of the right trochanteric bursa. (R. at 217.) It was noted that some points were exquisitely tender to even soft palpation. (R. at 217.) Halsey also identified a point more posterior in the region of the piriformis that she stated was tender with palpation. (R. at 217.) Following the procedure, Halsey was given a prescription for physical therapy to help evaluate and work with the piriformis irritation, and to help her with exercise and mobility strategies for her pain. (R. at 218.)

On September 13, 2005, Halsey returned to UVA with complaints of being "in constant pain" in her right hip. (R. at 214.) Halsey stated that the sacroiliac joint injections helped alleviate the pain for two or three days, but the pain consistently worsened afterwards. (R. at 214.) Halsey stated that the pain was worse with sitting, especially when driving a car with increased vibrations. (R. at 214.) It was noted that Halsey appeared frustrated because after multiple injections and physical therapy, her pain had not improved. (R. at 214.) After examination, the treating physician's impressions included greater trochanteric bursitis and chronic low back and hip pain. (R. at 215.) Halsey was prescribed Zanaflex, which was a stronger antispasmodic medication which would help with her muscle spasms. (R. at 215.) Halsey also was counseled on continued physical therapy with emphasis on a home stretching program. (R. at 215.) It was recommended that Halsey set up another appointment to have an MRI of the lumbar spine prior to her next clinical visit. (R. at 215.)

16

On October 17, 2005, Halsey returned to UVA with complaints of continued pain around her right hip including the right anterior superior iliac spine, ("ASIS"), area and the areas posterior and inferior to her greater trochanter. (R. at 209.) Halsey stated that Zanaflex had relieved some of the pain, however, prolonged sitting, driving with vibration and walking all aggravated her hip pain. (R. at 209.) An MRI of Halsey's lumbar spine revealed only small annular tears at the L4-L5, L5-S1 levels. (R. at 209.) After examination, the treating physician's impression was chronic right hip pain with unknown etiology. (R. at 210.) It was opined that Halsey's right hip pain could be from the muscle strain as well as a neuropathic pain from her motor vehicle accident. (R. at 210.) Halsey was prescribed Topamax, as well as a trial of TENS, an inferential muscle stimulator, for her right hip pain. (R. at 210.)

On January 13, 2006, Halsey presented to UVA with complaints of right hip pain radiating down to the buttocks. (R. at 206.) At this point, Halsey had undergone one year of physical therapy with ultrasound and aqua therapy with no relief. (R. at 206.) It was noted that Halsey appeared frustrated, stating that her pain was aggravated with activity and vibration. (R. at 206.) Upon examination, it was noted that Halsey had pain with palpation of a well-circumscribed region in the right hip. (R. at 206.) In addition, Halsey had some reproduction of her pain down her buttock. (R. at 206.) Halsey was prescribed Cymbalta for her pain and Elavil for her sleeping problems. (R. at 207.) In addition, the treating physician discussed with Halsey the possibility of a spinal cord stimulator as a last resort. (R. at 207.) Another option that was discussed was a caudal epidural steroid injection to help with the pain that occurred after prolonged periods of sitting. (R.

at 207.) Halsey was given a DVD and brief summary of how the stimulator works, which discussed the risks and benefits. (R. at 207.)

On February 15, 2006, Halsey returned to UVA with complaints of right hip pain radiating down the lateral aspect of the right lower extremity. (R. at 202.) After examination, the treating physician opined that Halsey might benefit from a right sacroiliac joint injection, which she had not yet received. (R. at 203.) Halsey also asked the treating physician if the clinic would call her attorney. (R. at 203.) Halsey explained that she had exceeded her medical allowance allowable from her car insurance company, and they were looking to have the other person involved in the motor vehicle accident start paying for her medical expenses. (R. at 203.) Halsey needed the clinic to contact her attorney to have him go ahead and pursue this action. (R. at 203.)

One February 24, 2006, Halsey returned to UVA with complaints of right hip and thigh pain. (R. at 199.) After examination, the treating physician noted that Halsey's exam was not consistent with either sacroiliac dysfunction or radiculopathy. (R. at 200.) In addition, it was noted that the etiology of her pain was unclear, but it did not appear to follow the path of her iliotibial band. (R. at 200.) The treating physician discussed with Halsey the possibility of Botox injections, acupuncture therapy and a spinal cord stimulator. (R. at 200.) Halsey stated that she would think about the various treatments. (R. at 200.) The treating physician opined that "at this point, we have very little to offer her as treatment options." (R. at 200.)

On June 8, 2006, Dr. Surrusco, a state agency physician, completed a

Physical Residual Functional Capacity Assessment, ("PRFC"), finding that Halsey could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 253.) Dr. Surrusco opined that Halsey could occasionally balance, stoop, kneel, crouch and crawl, but could never climb. (R. at 254.) He imposed no manipulative, visual or communicative limitations. (R. at 254-55.) He did note one environmental limitation, which was to avoid even moderate exposure to hazards, such as machinery and heights. (R. at 255.)

In assessing the credibility of the claimant's statements regarding symptoms and their affects on function, Dr. Surrusco considered Halsey's medical history, the character of her symptoms, her activities of daily living, the type of treatment she received and the response to this treatment. (R. at 304.) Dr. Surrusco noted that Halsey described daily activities that were not significantly limited in relation to her alleged symptoms. (R. at 259.) In addition, he noted that the medical evidence showed that despite ongoing treatment, Halsey continued to have pain which significantly impacted her ability to perform work-related activities. (R. at 259.) Dr. Surrusco opined that, based on the evidence of record, Halsey's statements were only partially credible. (R. at 259.)

On October 31, 2006, Dr. Hartman, a state agency physician, completed a PRFC, finding that Halsey could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of

about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 275.) Dr. Hartman imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 276-77.) Dr. Suansilppongse, a state agency physician, concurred with Dr. Hartman's conclusion. (R. at 281.)

On March 26, 2006, Halsey presented to St. Francis Hospital for a right sacroiliac joint injection and was given a post-operative diagnosis of arthropathy sacroiliac joint, lumbar disc disease and lumbar pain with muscle spasm. (R. at 303.) On January 12, 2007, Halsey had an MRI of the lumbar spine, which showed disc desiccation at the L4-5 and L5-S1 levels, and a small transverse rent present in the L4-5 disc to the right of the midline. (R. at 304.) However, there was no herniated nucleus pulposus seen. (R. at 304.)

On February 16, 2007, Halsey presented to St. Francis Hospital with complaints of right hip pain, low back pain and right leg pain down to her knee. (R. at 296.) Dr. Deer reviewed Halsey's MRI, noting that she had a rent at the L4-L5 disc which may have been the cause of her pain. (R. at 297.) Dr. Deer recommended that Halsey undergo a lumbar discogram at that level, and if found to be abnormal, she may be a candidate for IDET. (R. at 207.) He also noted that if the tear was found to be severe, Halsey may be a candidate for artificial disc replacement. (R. at 297.)

On March 30, 2007, Halsey presented to St. Francis Hospital for a diagnostic lumbar discogram at the L3-4 and L4-5 discs. (R. at 298.) Following the procedure, Dr. Bowman stated that Halsey had primarily axial as compared to leg pain with respect to her symptoms. (R. at 299.) He also stated that the pain was

20

caused primarily by the L4-5 disc, and because of this, disc decompression with microdiscectomy or percutaneous discectomy would be less likely to be helpful. (R. at 299.) However, he stated that there was some medical evidence that IDET might be a helpful procedure. (R. at 299.)

On April 17, 2007, Halsey again presented to St. Francis Hospital with complaints of back and lower extremity pain. (R. at 301.) Dr. Bowman determined that Halsey had discogenic pain at the L4-5 disc, and he recommended IDET to that disc. (R. at 283, 301.) On May 25, 2007, Halsey returned to St. Francis Hospital with complaints of low back pain from her right hip to her right knee. (R. at 282.) Dr. Bowman recommended either continued IDET or disc replacement surgery. (R. at 282.) He noted that Halsey requested more information on disc replacement surgery. (R. at 282.)

On October 18, 2007, Halsey presented to Dr. Kropac at the Orthopaedic Center of the Virginias for an independent medical examination. (R. at 306.) Halsey reported that she had constant lower back pain that increased with any type of activity, moving of any sort, bending, stooping, twisting, as well as sitting and standing. (R. at 307.) Halsey further complained of pain in the right hip and right lower extremity with sitting and standing. (R. at 307.) Upon examination, Dr. Kropac noted tenderness over the posterior spinal processes and interspinous ligaments from L4 to S1 and over the right related paraspinal muscle masses adjacent to these levels of the lumbosacral spine. (R. at 307.) Dr. Kropac also report tenderness in Halsey's right buttock. (R. at 307.) Dr. Kropac noted a full range of motion of all joints and lower extremities with complaints, however, with increasing lower back pain on ranging of the right hip. (R. at 308.) Halsey was

21

able to heel and toe walk without evidence of weakness, and it was noted that her gait was not antalgic in nature. (R. at 308.) After reviewing Halsey's past medical records, Dr. Kropac diagnosed discogenic lower back disease with right lower extremity radicular component. (R. at 310.) Dr. Kropac stated that "based on Ms. Halsey's history, her physical findings, review of available medical records and taking into consideration her age, education, and prior work experience, she is considered permanent totally disabled for gainful employment and should indeed be allowed to receive Social Security Disability benefits at this time." (R. at 310.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that

22

the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Halsey v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 5, 2007, the ALJ denied Halsey's claim. (R. at 13-19.) The ALJ found that Halsey met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 15.) The ALJ determined that Halsey had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 15.) The ALJ also found that Halsey suffered from back pain. (R. at 15.) The ALJ found that this impairment was "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). (R. at 15.) However, the ALJ determined that Halsey did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ also found that Halsey possessed the residual functional capacity to perform a limited range of sedentary work[5] that allowed Halsey to lift or carry items weighing up to 10 pounds. (R. at 16). The ALJ found that Halsey was able to stand or walk up to two hours in an eight hour day, and sit up to six hours in an eight-hour day. (R. at 16.) In addition, the ALJ found that the claimant could occasionally kneel, crouch, crawl, balance and stoop. (R. at 16.) The ALJ also found that the claimant should not work at heights, should not climb ladders, ropes or scaffolds and should work in

---

[5] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a)

23

temperature controlled environments. (R. at 16.) The ALJ determined that Halsey was capable of performing past relevant work as a marketing/public relations person and business office manager. (R. at 18.) The ALJ further stated that such work does not require the performance of work-related activities precluded by the Halsey's residual functional capacity. (R. at 18.) Therefore, the ALJ found that Halsey was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 18.) *See* 20 C.F.R. § 404.1520(f).

Halsey argues that the ALJ erred by failing to properly consider certain factors in assessing the claimant's credibility in making a pain evaluation. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Second, Halsey argues that the ALJ erred by improperly determining Halsey's residual functional capacity, ("RFC"); (Plaintiff's Brief at 6-9.) Specifically, Halsey argues that the ALJ's determination of her RFC is not supported by substantial evidence of record. (Plaintiff's Brief at 6-9.) Third, Halsey argues that the Appeals Council erred by not remanding the case based on the evidence of Dr. Kropac's evaluation, as well as additional medical records of treating sources from Dr. Quasir Raza, M.D. and Dr. Edgar N. Weaver, Jr., M.D. (Plaintiff's Brief at 8-9). Specifically, Halsey argues that the supplemental documentation presented to the Appeals Council, as well as the additional medical records provided with her brief, meet the requirements of 42 U.S.C. § 405(g) sentence six and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985), as being material to the determination of disability. (Plaintiff's Brief at 9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court

24

must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports his findings.

Halsey first argues that the ALJ erred by failing to properly consider certain factors in assessing the claimant's credibility in making a pain determination. (Plaintiff's Brief at 4-5.)

The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the

Case 1:08-cv-00004-GMW-PMS   Document 23   Filed 01/23/09   Page 25 of 41   Pageid#: 480

existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [her] pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [she] suffers...

*Craig*, 76 F.3d at 595. In addition, 20 C.F.R. § 404.1529(c) provides factors which an ALJ must consider when assessing a claimant's credibility as it relates to pain. Among these factors include a claimant's daily activities; location, duration, frequency and intensity of the pain; factors that may precipitate and aggravate it; medications; treatment; any measures the claimant has used to relieve the symptoms; and any other factors regarding a claimant's functional limitation and restriction due to pain. 20 C.F.R. § 404.1529(c). The ALJ complied with step one of the two-step process by stating that Halsey's back impairment could reasonably cause the alleged pain with walking, sitting, standing and lifting for prolonged periods. (R. at 17.) However, the ALJ further stated that the intensity, persistence

26

and limiting effects alleged were "not entirely credible." (R. at 17.)

Halsey argues that the ALJ's analysis of her pain was insufficient, as it failed to fully consider all of the credibility factors under 20 C.F.R. § 404.1529(c). Halsey argues that the depositions in the record from Dr. Deer and Dr. Bowman corroborate her testimony concerning the extent and intensity of her pain. (Plaintiff's Brief at 5.) Dr. Deer diagnosed a musculoskeletal axial pain type syndrome together with myofascial pain. (R. at 130-146.) Dr. Bowman, who administered the discogram, described Halsey's pain as "pretty severe pain across the back itself, where I say axial back pain, across the level where the disc was anatomically, but the pain --- the important part is that the pain radiated down into the right buttock." (R. at 149.)

Halsey additionally argues that the ALJ insufficiently factored in her statements regarding the intensity, persistence and limiting affects of her symptoms. (Plaintiff's Brief at 6.) Specifically, Halsey argues that she cannot grocery shop or do laundry without help, cannot stand and cook for prolonged periods and can only walk short distances. (Plaintiff's Brief at 6.) The undersigned finds that the ALJ sufficiently evaluated Halsey's pain. The ALJ noted that Halsey had low back pain radiating into the right hip and leg which interfered with her ability to lift, stand, walk and sit for prolonged periods. (R. at 17.) The ALJ considered medical records from UVA-Healthsouth and Dr. Schuett which reveal a history of automobile accident with low back pain radiating into the right hip. (R. at 17.) The ALJ also considered medical records from UVA, where Halsey consistently stated that the pain was exacerbated by sitting in a car for two hours, walking or with increased activity. (R. at 17.) The ALJ noted that Halsey

27

underwent several sacroiliac and bursa injections, which Halsey stated only relieved the pain for a few days. (R. at 17.) The ALJ considered an MRI from October 2005, which showed small annular tears at the L4-L5 and L5-S1 levels. (R. at 17.) The ALJ also considered medical records from Dr. Bowman and Dr. Deer from November 2006 through May 2007, which indicated some tenderness over the sacroiliac joint and bursa. (R. at 18.) The ALJ also considered a lumbar discogram from March 2007 which confirmed discogenic changes particularly at L4-L5. (R. at 18.)

The ALJ also considered the findings of Dr. Surrusco, a state agency physician, who found that Halsey could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 253.) Dr. Surrusco opined that Halsey could occasionally balance, stoop, kneel, crouch and crawl, but could never climb. (R. at 254.) He imposed no manipulative, visual or communicative limitations. (R. at 254-55.) He did note one environmental limitation, which was to avoid even moderate exposure to hazards, such as machinery and heights. (R. at 255.)

In assessing the credibility of the claimant's statements regarding symptoms and their effects on function, Dr. Surrusco considered Halsey's medical history, the character of her symptoms, her activities of daily living, the type of treatment she received and the response to this treatment. (R. at 304.) Dr. Surrusco noted that Halsey described daily activities that were not significantly limited in relation to her alleged symptoms. (R. at 259.) In addition, he noted that the medical evidence

28

showed that despite ongoing treatment, Halsey continued to have pain which significantly impacted her ability to perform work-related activities. (R. at 259.) Dr. Surrusco opined that, based on the evidence of record, Halsey's statements were only partially credible. (R. at 259.)

In addition, the ALJ considered the findings of Dr. Hartman, a state agency physician, who found that Halsey could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 275.) Dr. Hartman imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 276-77.) Dr. Suansilppongse, a state agency physician, concurred with Dr. Hartman's conclusion. (R. at 281.)

In addition to the stated medical records, the ALJ considered statements made by Halsey regarding the intensity, persistence and limiting affects of her symptoms. The ALJ found that Halsey was able to do light household chores, drive, shop, prepare meals and take care of personal needs. (R. at 17, 95-102.) After considering all of the evidence of record, the ALJ determined that Halsey was only capable of performing sedentary work, rather than light[6] work which was determined by the state agency physicians. (R. at 18.) Therefore, the ALJ properly considered all of the evidence of record, including the credibility factors in making her pain determination. Halsey contends that the ALJ failed to consider

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b).

29

the depositions of Dr. Bowman and Dr. Deer, arguing that the depositions corroborate her subjective complaints of pain. The undersigned does not dispute that Halsey experiences a certain degree of pain. Therefore, further considerations of those depositions would not change the outcome. The ALJ concurred with the medical evaluations, and as a result, lowered Halsey's RFC assessment from light work to sedentary work to accommodate for her pain. Halsey further argues that the ALJ mischaracterized her statements regarding the intensity, persistence and limiting affects of the symptoms. However, the ALJ used evidence of Halsey's function report in filing for disability, where she specifically stated that she was able to cook, do laundry, drive a car, feed and bathe her dogs and shop for groceries and clothes. (R. at 95-98.) At the hearing, Halsey testified that she was very limited in these activities and often needed help with many of them. As a result, the ALJ factored in Halsey's testimony in lowering her RFC assessment from light to sedentary work. Therefore, the ALJ properly evaluated Halsey's pain.

Second, Halsey argues that the ALJ erred by improperly determining Halsey's RFC. (Plaintiff's Brief at 6-9.) Specifically, Halsey argues that the ALJ's determination of her RFC is not supported by substantial evidence of record. (Plaintiff's Brief at 6-9.)

After reviewing the evidence of record, the ALJ made the finding that the Halsey was capable of performing a limited range of sedentary work. (R. at 18.) This finding was contrary to the findings of the state agency physicians that Halsey was capable of performing a limited range of light work. (R. at 18.) Halsey argues that the ALJ gave no medical reason for her determination and that she lacked the

30

expertise to arrive at such a determination on her own. (Plaintiff's Brief at 7.) The undersigned finds that the ALJ properly determined Halsey's RFC and this determination was supported by substantial evidence. Under the regulations, opinions on some issues are not medical opinions, but are instead opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case. 20 C.F.R. § 404.1527(e). One such opinion that is reserved to the Commissioner is the finding of a claimant's RFC. 20 C.F.R. § 404.1527(e)(2). In addition, the regulations state that "if your case is at the administrative law judge hearing level under 20 C.F.R. § 404.929, the administrative law judge is responsible for assessing your residual functional capacity." 20 C.F.R. § 404.1546(c). Therefore, the ALJ was justified in making an RFC determination that was different from the determination made by the state agency physicians. The ALJ is not required to have any additional expertise in making such a determination, as the power to make that determination is granted by the regulations.

The undersigned also finds that there was substantial evidence to support the ALJ's determination that Halsey could perform a limited range of sedentary work. The record showed that, following the car accident on September 5, 2004, Halsey's husband kept her on the payroll after the accident, despite the fact that she scaled back her hours because of doctor's appointments and therapy. (R. at 335.) Halsey stated that she would go in for an hour or so to answer questions from the staff and help with the computer, but otherwise she was unable to stay there and work. (R. at 335.)

The ALJ noted that, in 2005, Halsey reported an income of $19,320, which

31

was the result of a raise Halsey received from her husband. (R. at 335.) When asked what activities she did of value in 2005, Halsey stated that, other than the part-time work of answering questions and processing paperwork, she did not do anything physical. (R. at 336.) Halsey testified that in 2005, she was only working no more than six, eight or ten hours per week due to her physical condition. (R. at 336.) The ALJ questioned Halsey on her yearly income, to which Halsey noted that her husband paid her $19,000 a year to work six, eight, or ten hours per week. (R. at 336.) Halsey further clarified that her work after the accident was mainly business office clerical work, rather than any physical labor. (R. at 338.)

Halsey stated that she was unable to run a vacuum cleaner, go grocery shopping or do laundry without the help of her daughter. (R. at 343.) Despite using ergonomic mats and cushions, Halsey stated that she received no relief from the pain. (R. at 345.) Halsey stated that occasionally, if she started cooking dinner, her husband had to finish because it was too painful for her to stand on the tile in the kitchen. (R. at 344.) Halsey further stated that she was unable to wash dishes or stand over the stove because of the pain, noting that she also was unable to bathe her dog because it was too painful to bend over. (R. at 344.) Halsey noted that she was no longer able to jog, play tennis, snowboard or travel because of her injury. (R. at 345.) In addition, Halsey's attorney told the ALJ that her goal was to get rid of the pain, and if she was able to do so, she would like to rejoin her husband's business. (R. at 324.)

Based on the evidence of record, including both the administrative hearing testimony, as well as the medical records previously stated, the ALJ's RFC determination was supported by substantial evidence. For at least one year after

the accident, Halsey was able to do minimal work at her husband's business, consisting of mainly office work. While medical records convincingly show that Halsey suffers from right hip and lower back pain, the evidence is not substantial enough to render Halsey disabled, but rather indicates the she can perform a limited range of sedentary work.

Third, Halsey argues that the Appeals Council erred by not remanding the case based on the evidence of Dr. Kropac's evaluation, as well as additional medical records from treating sources Dr. Quasir Raza, M.D. and Dr. Edgar N. Weaver, Jr, M.D. (Plaintiff's Brief at 8-9.) Specifically, Halsey argues that the supplemental documentation presented to the Appeals Council, as well as the additional medical records provided with the filing of her brief, meet the requirements of 42 U.S.C. § 405(g) sentence six and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985), as being material to the determination of disability. (Plaintiff's Brief at 9.)

The court will first consider the additional medical records that were attached to the Plaintiff's Brief. Halsey submitted treatment notes from May 16, 2006, to March 7, 2007, from Dr. Raza and his physician's assistant, Kimberly A. Matzel.[7] Halsey also submitted treatment notes from neurologist Dr. Weaver from August 2008, through October 2008, whereby Halsey was diagnosed with severe axial antigravity pain.[8]

Pursuant to 42 U.S.C. § 405(g) sentence six,

---

[7] Such evidence was attached as Exhibit 2 to the Plaintiff's Brief.
[8] Such evidence was attached as Exhibit 3 to the Plaintiff's Brief.

> [this] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

According to the Supreme Court, "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand [than the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). Thus, in order for the court to properly grant a remand under sentence six of § 405(g), the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins*, 953 F.2d at 95-96. For the purposes of this analysis, evidence is considered new "if it is not duplicative or cumulative." *See Wilkins*, 953 F.2d at 96. Furthermore, as stated in *Wilkins*, "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." 953 F.2d at 96; *see also Borders*, F.2d at 956 (4th Cir. 1985).

It is also imperative that good cause be shown for the failure to incorporate the new evidence into the record in a prior proceeding. Various courts have interpreted the "prior proceeding" language to include the ALJ stage of review, as well as the Appeals Council stage of review. *See Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. February 20, 2008) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the

34

Appeals Council."); *see also Ingram v. Astrue*, 496 F.3d 1253, 1269 (11th Cir. 2007) ("'[T]he question [under the sixth sentence] is not whether there is good cause for failure to present the evidence at the ALJ level, but rather for failure to present it at the administrative level, which includes the Appeals Council stage.'") (quoting *White v. Barnhart*, 373 F. Supp. 2d 1258, 1265 (N.D. Ala. 2005)).

The undersigned finds that the additional medical evidence presented by Halsey with the filing of her brief is both new and relates to the period on or before November 7, 2008, the date of the ALJ's decision. The evidence is new because it does not appear to be duplicative or cumulative of evidence already in the record. The new evidence shows that on August 1, 2006, Halsey presented to Bluefield Internal Medicine ("Bluefield") with complaints of migraine headaches and poison ivy on her arms and legs. (Plaintiff's Brief, Exh. 2, p. 2.) Halsey also complained of occasional blood accompanying her bowl movements, as well as severe ripping-type pain in her right hip and lower back, which was the result of a car accident. (Plaintiff's Brief, Exh. 2, p. 3.) A physical examination by Kimberly Matzel, PA-C, revealed no weight loss, fatigue, sleep disturbance, appetite problems, changes in skin, sexual dysfunction, headaches, hearing or visual problems, difficulty swallowing, difficulty breathing or coughing, chest pain, abdominal pain, nausea, vomiting, bowel problems, urinary problems or discharge, joint pain, numbness or weakness of extremities. (Plaintiff's Brief, Exh. 2, p. 3.) Matzel's assessment included constipation, questionable etiology, migraine headaches, contact dermatitis and premenstrual dysphoric disorder, ("PMDD").

On March 7, 2007, Halsey presented to Bluefield with complaints of menstrual problems, such as bleeding and migraine headaches accompanying her

35

periods. (Plaintiff's Brief, Exh. 2, p. 5.) Matzel noted that Halsey had been on prophylactic medication such as BETA blockers and Topamax for headaches in the past, but really had not needed it. (Plaintiff's Brief, Exh. 2, p. 5.) Matzel's assessment included abnormal menstrual bleeding, menstrual migraines and PMDD. (Plaintiff's Brief, Exh. 2, p. 5.) Matzel prescribed Halsey with Prozac. (Plaintiff's Brief, Exh. 2, p. 5.)

On August 7, 2007, Halsey presented to Bluefield for a physical examination by Dr. Raza with chief complaints of a poison oak outbreak. (Plaintiff's Brief, Exh. 2, p. 6.) Dr. Raza diagnosed Halsey with contact dermatitis and insomnia. (Plaintiff's Brief, Exh. 2, p. 5.) On February 22, 2008, Halsey again presented to Bluefield with chief complaints of a cold, chills and achiness for the previous 72 hours. (Plaintiff's Brief, Exh. 2, p. 7.) A physical examination revealed tenderness to both frontal and maxillary sinuses bilaterally, but the mouth and throat were otherwise clear. (Plaintiff's Brief, Exh. 2, p. 7.) Dr. Raza's overall assessment included an upper respiratory infection, ("URI"), sinusitis and exposure to the flu as a result of contact with her husband. (Plaintiff's Brief, Exh. 2, p. 7.)

The court recognizes that the following medical facts are dated after November 7, 2008, the date of the ALJ's decision. Therefore, they will only be summarized for clarity of the record. On July 22, 2008, Halsey presented to Bluefield with chief complaints of recurrent back pain that radiated into the gluteal and sacroiliac area and into the right greater trochanteric region. (Plaintiff's Brief, Exh. 2, p. 8.) Halsey described the pain as constant, however, she had intermittent exacerbation of pain that would come and go. (Plaintiff's Brief, Exh. 2, p. 8.) A review of systems showed no chest pain, however, Halsey did have chronic pain in

her lower back with radiation into her right side, as well as dysthesias. (Plaintiff's Brief, Exh. 2, p. 8.) A physical examination revealed tenderness in the L3-L4 region, as well as in the right sacroiliac area. (Plaintiff's Brief, Exh. 2, p. 8.) It also revealed no tenderness on palpation and super greater trochanteric bursa tenderness to palpation. (Plaintiff's Brief, Exh. 2, p. 8.) The exam also revealed that Halsey had trouble with flexion, extension, internal and external rotation. (Plaintiff's Brief, Exh. 2, p. 8.) Dr. Raza's overall assessment included L3-L4 disc dissection L4-L5, L5-S1 and small transverse rent of L4-L5 discs to the right of the midline. (Plaintiff's Brief, Exh. 2, p. 8.) At this time, Halsey was referred to Dr. Weaver for an MRI of her back. (Plaintiff's Brief, Exh. 2, p. 8.)

On October 15, 2008, Matzel completed an RFC, in which she stated that Halsey could occasionally lift and/or carry less than 10 pounds no more than one-third of an eight hour workday; frequently lift and/or carry less than 10 pounds for one-third to two-thirds of an eight hour workday; stand, walk and sit less than two hours of an eight hour workday, with the need to shift at will from sitting to standing or walking, and with the need to lie down at unpredictable intervals during a work shift. (Plaintiff's Brief, Exh. 2, pp. 13-14.) Matzel also found that Halsey could occasionally balance, but never climb, stoop, crouch, kneel or crawl. (Plaintiff's Brief, Exh. 2, p. 14.) In addition, Matzel found that Halsey's ability to reach, handle, feel, push and pull would be affected be her impairment, but that her ability to see, hear and speak would be unaffected. (Plaintiff's Brief, Exh. 2, p. 14.) Matzel found Halsey's complaints to be credible. (Plaintiff's Brief, Exh. 2, p. 16.) Matzel stated that she would anticipate that Halsey would need to be absent from work more than three times a month. (Plaintiff's Brief, Exh. 2, p. 16.)

37

In a letter dated August 14, 2008, Dr. Weaver stated that Halsey had severe axial antigravity pain, as well as vague pain in the right hip area which was primarily axial back pain. (Plaintiff's Brief, Exh. 3, p. 1.) Dr. Weaver noted that an MRI scan revealed a high intensity zone at both L4-L5 and L5-S1. (Plaintiff's Brief, Exh. 3, p. 1.) He additionally noted that Halsey had good disc height with annular discogenic pain, and opined that a stabilization procedure was necessary. (Plaintiff's Brief, Exh. 3, p. 1.) Dr. Weaver stated that Halsey had not had an MRI for 18 months; thus, he wanted to evaluate a new one to see whether one particular disc has degenerated more than the other one. (Plaintiff's Brief, Exh. 3, p. 1.) He also recommended a Dynesys flexible stabilization with fusion at one level. (Plaintiff's Brief, Exh. 3, p. 1.)

On August 18, 2008, Dr. Weaver reviewed Halsey's new MRI, noting that nothing had really changed and that she still had Grade III degenerative disease at L4-L5 and L5-S1. (Plaintiff's Brief, Exh. 3, p. 2.) Dr. Weaver further discussed with Halsey the possibility of a Dynesys procedure from L3 to S1 with posterolateral fusion at L4-L5. (Plaintiff's Brief, Exh. 3, p. 2.) He noted that prior to doing this procedure, he wanted to try a lateral nerve block at L4-L5 to see whether this would reduce the pain. (Plaintiff's Brief, Exh. 3, p. 2.) On October 8, 2008, Halsey presented to Carilion Health System for an injection procedure consisting of a bilateral L4 and L5 nerve block. (Plaintiff's Brief, Exh. 3, pp. 4-5.) On October 23, 2008, Halsey presented to Dr. Weaver after having had two injections in her back, reporting that the injections had no effect on her back pain. (Plaintiff's Brief, Exh. 3, p. 3.) Dr. Weaver stated that a stabilization procedure was necessary. (Plaintiff's Brief, Exh. 3, p. 3.)

Although the additional medical evidence is new in that it presents new medical findings, such as abnormal menstrual bleeding, menstrual migraines, PMDD and poison ivy, the undersigned finds that none of these new medical facts are material in that such evidence would not change the outcome of the ALJ's decision, under the standard set forth in 42 U.S.C. § 405(g) sentence six and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). A majority of Halsey's complaints in the record speak of constant lower back and right hip pain that radiates down into her lower extremities, resulting from a motor vehicle accident. The new evidence presented by Halsey that falls within the relevant time period speaks of ailments that are seemingly unrelated to her claim for disability. As a result, the undersigned does not find this new evidence to be material, and believes that it would not change the outcome of the ALJ's decision had it been properly considered by the ALJ. The undersigned would like to note that the additional evidence submitted with Halsey's brief, which falls outside of the relevant time period, suggests that Halsey's back pain could be severe enough to warrant either a finding of disability, or a restriction of work more severe than the ALJ's finding. However, Halsey's only recourse in this instance would be to file a new application for disability because this particular evidence is not relevant to the time period on or before the ALJ's decision, and was thus properly rejected by the Appeals Council. *See* 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1); *see generally* 20 C.F.R. §§ 404.620(a)(2), 416.330(b).

The court will next consider Halsey's argument that the Appeals Council erred by not remanding the case based on the evidence of Dr. Kropac's evaluation. In this case, after the ALJ hearing, Halsey's counsel submitted additional records to the Appeals Council. (R. at 306-315.) The Appeals Council found no reason

Case 1:08-cv-00004-GMW-PMS   Document 23   Filed 01/23/09   Page 39 of 41   Pageid#: 494

under the rules to review the ALJ's decision; thus, the ALJ's decision was affirmed and Halsey's request for review was denied. (R. at 5-6.) The Appeals Council specifically explained that it considered the report from Dr. Kropac dated October 18, 2007, as well as a letter from Halsey's representative dated December 28, 2007. (R. at 5-6.) However, the Appeals Council determined that the information did "not provide a basis for changing the [ALJ's] decision." (R. at 6.)

Here, without addressing whether the additional evidence was new, material and related to the relevant time period, it is clear that Dr. Kropac's findings were presented to the Appeals Council and thus incorporated into the record. As such, this court is not permitted to remand pursuant to sentence six because the evidence was properly made a part of the record by the Appeals Council. *See Edwards*, 2008 U.S. Dist. LEXIS at *23; *Ingram*, 496 F.3d at 1269; *see also Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th Cir. 1992) ("[O]nce the evidence is submitted to the Appeals Council it becomes part of the record, thus it would not make sense to require [the claimant] to present good cause for failing to make it part of a prior proceeding's record.")

After review, the undersigned finds that the medical evaluation performed by Dr. Kropac was considered and rejected by the Appeals Council, and was thus made part of the record. As such, the court is not permitted to remand based on the standard set forth in 42 U.S.C. § 405(g) sentence six and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) because sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council. *Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. February 20, 2008).

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Halsey's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This _23rd_ day of January, 2009.

_____

**THE HONORABLE GLEN M. WILLIAMS**
**SENIOR UNITED STATES DISTRICT JUDGE**

41